OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Thomas J. Fleming
Andrea Fischer
Melanie Sacks
212.451.2300
*Proposed Special Litigation Counsel to George L. Miller, Chapter 7 Trustee of Suffolk LLC for all cases except Credit Suisse First Boston (09-cv-02885 JSR) and Steve Shulman (09-cv-02936 JSR).*

CIARDI CIARDI & ASTIN, P.C.
One Commerce Square
2005 Market Street, Suite 1930
Philadelphia, PA 19103
Albert A. Ciardi, III
Carl Singley
Dimitri Karapelou
215.557.3550
*Counsel to George L. Miller, Chapter 7 Trustee of Suffolk LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re REFCO, INC. SECURITIES LITIGATION | : : : : : | 07 MDL No. 1902 (JSR) |
| GEORGE L. MILLER, Chapter 7 Trustee for the Estate of Suffolk LLC, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : : | |
| PF SALECO LLC, GRYPHON HOLDINGS II, **LLLP**, GRYPHON HOLDINGS L.P., SMS SECURITIES AG, BRUCE RAUNER, CHARLES DILL, DONALD ROSENFELD, MICHAEL DONAHUE, B. | : : : : : : : | |

916691-2

| | | |
|---|---|---|
| DOUGLAS MORRISS, JOHN S. | : | |
| WEHRLE, HF INVESTMENTS AG, | : | |
| AND PF REPRESENTATIVES LLC | : | 09-cv-02866-JSR |
| TERENCE WILLIAMS | : | 09-cv-02867-JSR |
| WARNE WORLDWIDE | : | 09-cv-02868-JSR |
| BRERA CAPITAL PARTNERS, LLC | : | 09-cv-02870-JSR |
| ADAM N. LYLE | : | 09-cv-02871-JSR |
| ALLENE CHUNG | : | 09-cv-02872-JSR |
| ANDREW B. DOUGLASS | : | 09-cv-02873-JSR |
| ANDRE PEROLD | : | 09-cv-02874-JSR |
| ANDREW MOLLOY | : | 09-cv-02875-JSR |
| BRADD KATA | : | 09-cv-02876-JSR |
| CAROLE SCHEIDT NYSTROM, TTE | : | 09-cv-02877-JSR |
| MILESTONE VENTURE PARTNERS | : | 09-cv-02878-JSR |
| CHARLES B. HINTZ | : | 09-cv-02879-JSR |
| CHRISTIAN FABER | : | 09-cv-02880-JSR |
| CHRISTOPHER ROSE | : | 09-cv-02881-JSR |
| CHRISTOPHER SUAN | : | 09-cv-02882-JSR |
| CHRISTOPHER WELCH | : | 09-cv-02883-JSR |
| CONNIE HSU | : | 09-cv-02884-JSR |
| CSFB, **A/K/A CREDIT SUISSE FIRST** | : | |
| **BOSTON NEXT FUND, INC.** | : | 09-cv-02885 JSR |
| DANIEL LEHMANN | : | 09-cv-02886-JSR |
| DAVID CODY | : | 09-cv-02887-JSR |
| THE SUAN FAMILY IRREVOCABLE | : | |
| CHILDREN'S TRUST | : | 09-cv-02888-JSR |
| CAPGEMINI U.S., LLC | : | 09-cv-02889-JSR |
| DAVID DONNINI[1] | : | 09-cv-02890-JSR |
| DAVID SALLE | : | 09-cv-02891-JSR |
| DIEGO WINEGARDNER | : | 09-cv-02892-JSR |
| DON MURPHY | : | 09-cv-02893-JSR |
| EDGAR D. JR. JANNOTTA | : | 09-cv-02894-JSR |
| EDWARD J. KATA | : | 09-cv-02895-JSR |
| EDWARD J. KATA AND | : | |
| LORRAINE KATA | : | 09-cv-02896-JSR |
| MILESTONE VENTURE PARTNERS | : | 09-cv-02897-JSR |
| DONALD J. EDWARDS | : | 09-cv-02898-JSR |
| FREDERICK W. GLUCK | : | 09-cv-02899-JSR |
| FREDERICK W. **GLUCK** JR. | : | 09-cv-02900-JSR |
| GLENN KATA | : | 09-cv-02901-JSR |
| GREG **PAPPAJOHN** AND SUSAN | : | |
| GLUCK | | 09-cv-02902-JSR |
| GREG PAPPAJOHN | : | 09-cv-02903-JSR |
| GREGG KATA | : | 09-cv-02904-JSR |

---

[1] This is the Second Amended Complaint for case 09-cv-02890 as this case was previously amended.

916691-2

| | | |
|---|---|---|
| HARRY DAVID PRECHEUR | : | 09-cv-02905-JSR |
| HARRY SHAW | : | 09-cv-02906-JSR |
| HUGH ALLEN | : | 09-cv-02907-JSR |
| ILO LIU | : | 09-cv-02908-JSR |
| INNOVATION INVESTMENTS, LLC | : | 09-cv-02909-JSR |
| JAMES LYNCH | : | 09-cv-02910-JSR |
| JAMES MURRAY, III | : | 09-cv-02911-JSR |
| JAYME COLTER | : | 09-cv-02912-JSR |
| JEFFREY & JILL WEISS | : | 09-cv-02913-JSR |
| JENNIFER KNIGHT | : | 09-cv-02914-JSR |
| JOEL PRESS | : | 09-cv-02915-JSR |
| JOHN E.KORETZ | : | 09-cv-02916-JSR |
| JOSHUA MAILMAN | : | 09-cv-02917-JSR |
| TRUST UAD 12/29/86 FBO | : | |
| TARAN J. DAVIS | : | 09-cv-02918-JSR |
| **KINGDON** ASSOCIATES, **KINGDON** | : | |
| PARTNERS, M. **KINGDON** | : | |
| OFFSHORE NV, **KINGDON** | : | |
| FAMILY PARTNERSHIP | : | 09-cv-02919-JSR |
| LAB MORGAN CORPORATION | : | 09-cv-02920-JSR |
| LISA GLUCK | : | 09-cv-02921-JSR |
| ML IBK POSITIONS, INC. | : | 09-cv-02922-JSR |
| MURRAY CAPITAL | : | 09-cv-02923-JSR |
| NICOLAS J.WILLIAMS | : | 09-cv-02924-JSR |
| ODS HOLDINGS, LTD. | : | 09-cv-02925-JSR |
| PHILIP A.CANFIELD | : | 09-cv-02926-JSR |
| PROFIT-SHARING PLAN | : | |
| FBO SUZANNE LEHMANN | : | 09-cv-02927-JSR |
| RANDALL YANKER TTEE | : | 09-cv-02928-JSR |
| RANDALL YANKER | : | 09-cv-02929-JSR |
| ROBERT HILL | : | 09-cv-02930-JSR |
| ROBERT SUAN | : | 09-cv-02931-JSR |
| RODNEY YANKER | : | 09-cv-02932-JSR |
| RONALD W. FARMER | : | 09-cv-02933-JSR |
| SCOTT KATA | : | 09-cv-02934-JSR |
| STEPHEN FREIDHEIM | : | 09-cv-02935-JSR |
| STEVE SHULMAN | : | 09-cv-02936 JSR |
| SUSAN HAERY STAISIL | : | 09-cv-02937-JSR |
| TARAN J. DAVIES | : | 09-cv-02938-JSR |
| CALPURNIA CAPITAL | : | |
| PARTNERS, L.L.C. | : | 09-cv-02939-JSR |
| CHRISTOPHER SUGRUE | : | 09-cv-02940-JSR |
| CLIFF DESOUZZA | : | 09-cv-02941-JSR |
| **ULF** HJELM | : | 09-cv-02942-JSR |
| KOCH VENTURES, INC. | : | 09-cv-02943-GEL |
| PEACHTREE EQUITY PARTNERS, L.P. | : | 09-cv-02944-JSR |

| | |
|---|---|
| TODD KATA | : 09-cv-02945-JSR |
| VINCENT J. HEMMER | : 09-cv-02946-JSR |
| WALTER NOEL, JR | : 09-cv-02947-JSR |
| WILLIAM KESSINGER | : 09-cv-02948-JSR |
| CAMERON HIGHLANDS | : 09-cv-02949-JSR |
| CAPITAL STRUCTURE ARBITRAGE | : 09-cv-02950-JSR |
| DAVID BROWN | : 09-cv-02951-JSR |
| EXCOLATOR | : 09-cv-02952-JSR |
| GAD CORP. | : 09-cv-02953-JSR |
| GREENVIEW INVESTMENTS, INC. | : 09-cv-02954-JSR |
| HATEM EL NASER | : 09-cv-02955-JSR |
| KENNETH SHEN | : 09-cv-02956-JSR |
| SENECA, INC. | : 09-cv-02957-JSR |
| SUMMERLAND LTD. | : 09-cv-02958-JSR |
| | : |
| Defendants.[2] | : |

**AMENDED COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS
PURSUANT TO 11 U.S.C. §§ 544, 548 AND 550 AND NY DCL § 270 ET SEQ.**

George L. Miller, in his capacity as Chapter 7 Trustee (the "Chapter 7 Trustee" or

"Plaintiff"), in the Chapter 7 case of Suffolk, LLC, pending in the United States Bankruptcy

Court for the District of Delaware ("Delaware Bankruptcy Court") as Case No. 07-10343 (the

"Suffolk Bankruptcy Case"), on behalf of the estate of Suffolk, LLC ("Suffolk" or the

"Debtor")), files this *Amended Complaint to Avoid and Recover Fraudulent Transfers Pursuant*

*to 11 U.S.C. §§ 544, 548 and 550 and NY DCL § 270 Et Seq.* (the "Amended Complaint")

against the above captioned defendants (the "Defendants") and alleges as follows:

**INTRODUCTION**

1.    Plaintiff is the Chapter 7 Trustee for a debtor that was created to purchase shares

of PlusFunds Group Inc. ("PlusFunds") with money that was borrowed from Refco Capital

---

[2] This Amended Complaint includes revisions to certain named defendants to correct inadvertent errors.
Plaintiff was notified by certain Defendants or their counsel that incorrect parties were named in the
original Complaint, or errors were noted in Plaintiff's further review of documents underlying the
Amended Complaint. Corrections are included for the following cases and noted above in the case
caption in bold text: 09-2866, 09-02885, 09-02942, 09-02900, 09-02902, and 09-02919.

4

LLC ("Refco Capital"), a regulated US entity, for the sole purpose of benefitting three fraudulent insiders to the detriment of legitimate creditors. Plaintiff seeks redress for a series of seemingly interconnected frauds: frauds that ultimately benefitted the insiders of the Debtor, to the detriment of the creditors of Suffolk (including Refco Capital), to the tune of at least $208 million dollars. The Suffolk Insiders (defined below) cooked up this fraud to benefit from their knowledge of the ongoing fraudulent activities of Phillip Bennett ("Bennett"), chief executive officer of one or more Refco companies. Also benefitting from this fraud were the transferees of the fraudulent conveyances, the Defendants in this action, who were the recipients of the funds used to purchase PlusFunds shares at exorbitant multiples of their true market value.

## NATURE OF ACTION

2.    The Chapter 7 Trustee brings this proceeding against the Defendants pursuant to sections 544, 548 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and, by incorporation, section 270 et seq. of the New York Debtor and Creditor Law ("NY DCL"), for the avoidance and recovery of the fraudulent conveyance of tender amounts paid to the Defendants by Suffolk in connection with the purchase of certain ownership interests in PlusFunds (the "PlusFunds Shares") through direct negotiation or a tender offer.

3.    The conveyances were made with the actual intent to hinder, delay or defraud the present and future creditors of Suffolk.

4.    Recovery of these fraudulent conveyances from the Defendants is sought pursuant to section 550(a)(1) of the Bankruptcy Code because the Defendants were the initial transferees or the entities for whose benefit the fraudulent conveyance was made.

5

5. In the alternative, recovery of the fraudulent conveyances is also sought from the Defendants pursuant to section 550(a)(2) of the Bankruptcy Code on the grounds that the Defendants were the immediate or mediate transferees, within the meaning of section 550(a)(2) of the Bankruptcy Code, and did not take the fraudulent conveyance for value, in good faith, and without knowledge of the voidability of the fraudulent conveyance.

## PARTIES

6. The Chapter 7 Trustee is the duly-appointed and acting Chapter 7 trustee of Suffolk, a Delaware corporation whose registered agent is Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808. Suffolk is not an operating business and, therefore, has no principal place of business.

7. The Defendants are individuals, corporations, limited liability companies, partnerships, sole proprietorships or trusts whose state of incorporation, organization, existence or residence is unknown.

8. The Defendants include residents and non-residents of the State of New York ("New York"). Upon information and belief, the Defendants do business in New York, are authorized or licensed to do business in the New York, have a presence in New York, or otherwise can be found in New York and/or Defendants engaged in the fraudulent transfer that was effectuated, transacted and carried out in New York.

9. The transactions that form the basis for this Amended Complaint, specifically the transfer of assets of Suffolk to the Defendants, occurred in New York.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding arising under title 11 of the United States Code pursuant to 28 U.S.C. § 1334(b).

916691-2

11. This Court has personal jurisdiction over the Defendants by virtue of the fact that, upon information and belief, Defendants transact business within the United States and/or New York, the wrongful conduct at issue in this action was committed within New York, and such wrongful conduct caused injuries within New York.

12. Venue is appropriate in this Court because the transfer of Suffolk's assets to the Defendants occurred in New York, and because of the close relationship to, and various overlapping facts with, the ongoing proceedings in multi-district litigation (*In re Refco Securities Litigation*, Case. No. 07-md-01902-GEL (S.D.N.Y.)) pending in the United States District Court for the Southern District of New York (the "Refco Multi-District Litigation").

13. The claims being advanced in the Refco Multi-District Litigation focus on, among other things, Refco (defined below), Suffolk, PlusFunds and others involved in the fraudulent transactions at issue in this action. Among the matters relevant to this action that are at issue in the Refco Multi-District Litigation are the relationships between Refco (defined below), Suffolk, PlusFunds, Bennett, and the Suffolk Insiders (defined below), and the reasons and purposes for the PlusFunds Tender Offer (defined below), Refco Capital's loans to Suffolk and the source of this money.

14. The Defendants are not parties to the Suffolk Bankruptcy Case and this action does not involve the claims adjudication process or debtor-creditor relations.

15. Furthermore, this action does not relate to any pending matter in the Delaware Bankruptcy Court. The Suffolk Bankruptcy Case is in its closing stages and it is not anticipated that there will be any further litigation in the Delaware Bankruptcy Court to recover assets of the estates of the Suffolk Entities (defined below). The primary action being taken by the Chapter 7 Trustee in the Delaware Bankruptcy Court relates to the collection of

default judgments entered against Christopher Sugrue ("Sugrue") stemming from his misconduct as a director of Suffolk MKK LLC and Suffolk SUG LLC.

## PROCEDURAL BACKGROUND

16.   On October 17, 2005, Refco, Inc. and certain of its direct and indirect affiliates (together "Refco") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.

17.   On March 6, 2006, PlusFunds filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

18.   On March 16, 2007 (the "Suffolk Petition Date"), Marc S. Kirschner, as Court-approved Trustee for the Refco Litigation Trust and representative of the estate of Refco, filed against Suffolk the Suffolk Bankruptcy Case, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 07-10343 (CSS).

19.   Marc S. Kirschner averred that as of Suffolk's Petition Date, Refco was Suffolk's only known non-contingent, liquidated creditor.  Since the entry of the Order for relief (as described below), numerous parties have filed claims in the Suffolk cases, and parties have indicated that amounts were due and owing from the Suffolk Entities (defined below), other than Refco.

20.   On April 11, 2007, the Delaware Bankruptcy Court entered an Order for relief in the Suffolk Bankruptcy Case.

21.   On April 17, 2007, the Chapter 7 Trustee was appointed as Chapter 7 trustee of the estates of Suffolk and its affiliated debtors.

8

22. On May 31, 2007, the Delaware Bankruptcy Court entered an order directing the procedural consolidation and joint administration of the Suffolk Bankruptcy Case with the Chapter 7 bankruptcy cases of Suffolk SUG LLC (Case No. 07-10342), Suffolk KAV LLC (Case No. 07-10341), and Suffolk MKK LLC (Case No. 07-10340) (together with Suffolk, the "Suffolk Entities").

## FACTUAL BACKGROUND

23. The fraud here arose through a series of complicated and interconnected actions described below.

**PlusFunds**

24. PlusFunds, a Delaware corporation, was a New York-based, United States registered, investment advisor that offered investment vehicles to qualified investors, including the SPhinX family of hedge funds (the "SPhinX Funds"). On information and belief, PlusFunds was co-founded by Sugrue and Diego Winegardner in 1998.[3] Both were officers and shareholders. Its other officers included Mark Kavanagh ("Kavanagh") and Brian Owens ("Owens") (together with Sugrue, the "Suffolk Insiders"), who were also shareholders of PlusFunds.

25. Sugrue was well known within Refco, having previously worked at Refco as Senior Vice President of Refco Group Ltd. Moreover, according to the testimony of Santo C. Maggio ("Maggio"),[4] Maggio suspected that Sugrue involved Refco in fraudulent activities unrelated to either the Refco Fraud (defined below) or the Suffolk Loans (defined below).

---

[3] PlusFunds was originally established as PlusFunds Ltd. In 2002 the company was recapitalized and the name changed to PlusFunds Group Inc.

[4] Maggio, was an executive at Refco and held positions at Refco including; President of Refco Securities, Executive Vice President of Refco Group and President of Refco Capital Markets. Maggio pled guilty to charges relating to the fraud that caused the collapse of the various Refco entities and, testified at a deposition regarding the Suffolk Loans (defined below) and the PlusFunds Tender Offer (defined below), in conjunction with the Suffolk Insiders.

9

Specifically, through Maggio, Sugrue solicited Refco to assist an Austrian bank, BAWAG, in fraudulently representing BAWAG's assets, allowing BAWAG to hide hundreds of millions of dollars in undisclosed losses. While these two frauds are not directly interrelated, Maggio described these activities as examples of "one hand wash[ing] the other".

26. Upon information and belief, Kavanagh was the brother-in law of Sugrue, and Owens was Kavanagh's personal accountant.

27. PlusFunds was an investment advisor that offered a wide range of private investment vehicles to qualified investors seeking exposure to hedge fund investments. PlusFunds also acted as an investment manager to three types of collective investment vehicles (the "Funds"): feeder funds, master funds and portfolio funds.

28. These managed Funds included the SPhinX Funds.

29. The assets invested with the Funds were held at various brokerage and financial institutions, including Refco related entities.

30. Importantly, various Funds managed by PlusFunds, including SPhinX Funds' assets, were held at Refco Capital Markets LLC ("RCM"), an unregulated Bermuda affiliate of Refco.

31. As testified by Maggio, RCM (or another Refco-related entity) provided the "seed" money that was needed to start the SPhinX Funds. As Maggio explained, approximately $70 million (the "Seed Money") was lent to SPhinX Funds and/or PlusFunds to start the SPhinX Funds family of funds, with the understanding that the Seed Money would be immediately deposited back with RCM—less the funds needed to satisfy minimum margin requirements. In light of this agreement, Maggio explained that he viewed the Seed Money loan as having a minimal impact on cash available for operations.

916691-2

32. Maggio further explained that PlusFunds agreed to use Refco (or its affiliates) as PlusFund's broker-dealer, and to run all clearing and executing services through the Refco family of companies. This scheme made hundreds of millions of dollars of cash available to RCM that Bennett could use to obscure the fraud Bennett was perpetrating on Refco, which included converting the assets of RCM to, among other things, hide a hidden intercompany receivable (the "Refco Fraud").

33. As Maggio, Bennett's co-conspirator, further testified, Sugrue, Maggio and Bennett were the only people aware that the Funds were being held at RCM. Maggio specifically testified that no one else at Refco was aware of this fact. Accordingly, at a minimum, the three independent members of Refco's Audit Committee, Refco's Chief Financial Officer, and Refco's General Counsel were all ignorant as to the fraudulent nature of these transactions.

34. Armed with this knowledge, the Suffolk Insiders devised a scheme to take advantage of Refco, and Bennett's need to ensure their silence. Through this scheme, the Suffolk Insiders were able to cash out their interests in PlusFunds at an inflated price.

35. To forward this scheme, the Suffolk Insiders coerced Bennett to acquiesce to a buyout of substantially all other existing shareholders of PlusFunds (the "PlusFunds Tender Offer"). It was decided that a "loan" to a third party—wholly owned by the Suffolk Insiders—was the best mechanism to move forward with the fraudulent scheme without implicating disclosure requirements.

36. As a result of this decision, the basic framework of the Suffolk fraud was born:

> *First* the Suffolk Insiders would form Suffolk as an entity wholly-owned by the Suffolk Insiders. In conjunction with this formation, the Suffolk Insiders would also form the related Suffolk Entities.

11

*Second*, Suffolk and Bennett would negotiate and enter into a "loan" that would fund the acquisition of all of the outstanding Preferred Shares of PlusFunds, as well as select Common Stock, Warrants and Options. This "loan" would be secured by the acquired PlusFunds shares, and would be payable "in kind" (if Suffolk defaulted on the loan payments, Refco Capital could exercise a call option on the PlusFunds shares).

*Third*, Suffolk would enter into a Stock Purchase Agreement to purchase the shares of Gabriel Bousbib ("Bousbib")—PlusFunds' former CEO, who was terminated by Kavanagh in what Bousbib characterized as a double-standard firing to proliferate the nepotism and breach of fiduciary duty that was rampant at PlusFunds (as described in more detail below);

*Fourth*, Suffolk would enter into a Membership Interest Purchase Agreement with other large, sophisticated shareholders that were insiders to the deal. Each of these agreements would enable Suffolk to pay share values that were wildly in excess of the actual value of the PlusFunds shares at the time of tender.

*Fifth*, Suffolk would use the money "loaned" from Refco Capital to execute a tender offer for certain classes of Preferred Shares, with the tender offer recipients receiving the same over-inflated value for their shares as the initial selling insiders.

*Finally,* Suffolk would use remaining "loan" monies to acquire additional Common Stock, Warrants, Options and Preferred Shares from select PlusFunds management and Board Members.

37. The end result of the scheme devised by the Suffolk Insiders is that they would own substantially all of the outstanding ownership interests in PlusFunds, and concomitantly, they would have full control over the PlusFunds assets under management—and the ability to direct where those funds were kept on deposit.

38. The Suffolk Insiders would gain this control without paying any money out of their own pockets. Further, they would acquire this control with no real risk—the loan could be satisfied by the tendering of PlusFunds shares if the underlying business venture did not prosper.

12

39. Finally, the Suffolk Insiders were paid their respective shares of the $50 million, which was "lent" to the Suffolk Entities and secured by PlusFunds stock. The Suffolk Insiders would use this money for their own enjoyment, and would not use the money to fund the underlying operations at PlusFunds, or for any benefit of the Suffolk Entities.

40. To set this fraud into motion, Sugrue approached Bennett, and asked if Refco would be interested in purchasing PlusFunds, or a portion of PlusFunds.

41. As testified to by Maggio, Sugure's approach was made because Sugrue, Kavanagh and Owens were aware that Bennett had masterminded a fraudulent enterprise at Refco, where RCM was utilizing client funds in an unauthorized manner.

42. The Suffolk Insiders knew that SPhinX Funds' assets were being improperly maintained at RCM.

43. The Suffolk Insiders knew that Bennett would need to direct Refco to purchase PlusFunds shares at an inflated price and through a transaction that was a windfall for the Suffolk Insiders, and the Suffolk Insiders used this knowledge to extort Bennett into agreeing to this transaction.

44. The money Suffolk and the other Suffolk Entities borrowed from Refco Capital to purchase the shares of PlusFunds made no economic sense. PlusFunds was generating approximately $3-4 million dollars a year in revenue, and the loan to purchase the PlusFunds shares was for approximately $208 million.

45. This inflated price also benefited the Defendants, sophisticated investors who knew, of willfully avoided knowing, the true value of PlusFunds and that they were being paid at a fraudulently inflated price for their shares

46. As testified by Maggio, a loan in the amount of $30-50 million, based on PlusFunds's earnings, would have made business sense.

47. The divergence in the Suffolk Loan amount and a reasonable business valuation for the PlusFunds shares is a direct result of the immoral bargaining "leverage" exerted by the Suffolk Insiders on Bennett.

48. Essentially, the Suffolk Insiders forced Bennett to acquiesce in this transaction with a "pay, or else" extortionary threat.

49. As a result of this scheme, Bennett directed Refco Capital to loan monies to Suffolk to purchase the PlusFunds Shares (the "Suffolk Loans"), and to provide a revolver to PlusFunds (the "PlusFunds Loan"), so that the Suffolk Insiders would not bear the risk of PlusFunds's potential losses.

50. The PlusFunds Loan was executed on April 13, 2005, and consisted of a secured 24-month, $25 million revolving standby credit agreement between Refco and PlusFunds. It is unknown whether the PlusFunds Loan was ever used by PlusFunds.

51. The PlusFunds Loan was characterized in the Offer to Purchase (defined below) as "a revolving Standby Credit Agreement with a financial services company to provide short-term liquidity to PlusFunds Group in connection with the SPhinX products and to augment the [PlusFunds] capital base."

52. The PlusFunds Loan was even more egregious when viewed in conjunction with the mismanagement, self-interest, and nepotism that permeated PlusFunds, as described by Bousbib.

## The Creation of Suffolk

53. Suffolk was established by the Suffolk Insiders - Sugrue, Kavanagh and Owens. Suffolk was established specifically to purchase the PlusFunds Shares.

54. In addition to Suffolk, and to further divert funds to the Suffolk Insiders, the Suffolk Insiders created Suffolk SUG LLC ("SUG"), Suffolk MKK LLC ("MKK"), and Suffolk KAV LLC ("KAV").

55. The purchase the PlusFunds Shares by Suffolk was funded by a portion of the proceeds of the Suffolk Loans, a series of loans totaling approximately $208 million, made to the Suffolk Entities by Refco Capital in March and April of 2005. Upon information and belief, these loans were funded with securities and foreign exchange assets deposited at RCM by its customers.

56. The Suffolk Entities had no employees or activities, and were thinly capitalized (if at all). On information and belief, prior to the purchase of the ownership interests in PlusFunds, the Suffolk Entities had no assets whatsoever.

## The Suffolk Loans

57. The PlusFunds Tender Offer was made with the proceeds from a series of loans from Refco to the Suffolk Entities, the Suffolk Loans. Specifically, the Suffolk Entities received four loans from Refco. The first, the "Phase I Loan" in the amount of $158 million from Refco Capital to Suffolk. The second, the "Phase II Loans" between Refco Capital and SUG, KAV and MKK in the amounts of $19.4 million, $11.35 million and $11.25 million, respectively. Each of the Suffolk Loans was secured by an option to purchase the PlusFunds Shares if Suffolk defaulted on the Suffolk Loans.

916691-2

58. The Suffolk Loans created no benefit to the Suffolk Entities, inuring only to the benefit of the Suffolk Insiders - providing a windfall to the Suffolk Insiders in furtherance of their fraudulent scheme.

59. The funds from the Phase I Loan were used by Suffolk to acquire the PlusFunds Shares from the Defendants and were advanced in a series of draws. Each draw allegedly required a collateral review by Refco Capital, in accordance with the credit agreement between Refco Capital and Suffolk; to ensure the shares were valid and appropriately transferred to Suffolk to secure the loan draws.

60. The funds from the Phase II Loans, though secured by shares in PlusFunds held by the Suffolk Insiders, were not directly used for the PlusFunds Tender Offer. Rather, these funds were diverted to the Suffolk Insiders, or to third parties for the benefit of the Suffolk Insiders.[5]

61. According to the Offer to Purchase (defined below), "in late 2004, following a discussion among the parties, B. Douglas Morriss and John S. Wehrle advised Mr. Kavanagh that the Gryphon Stockholders were interested in selling the Gryphon Stock to Mr. Kavanagh or a group led by him at a $250 million equity valuation of the Company."

62. The Gryphon Entities (defined below) were original investors in PlusFunds and two of the principals in the Gryphon Entities, B. Douglas Morriss and John S. Wehrle, were members of the PlusFunds Board until early 2005.

63. On information and belief the Gryphon Entities (defined below) were advisors to PlusFunds.

---

[5] The Chapter 7 Trustee filed actions in the Delaware Bankruptcy Court against Sugrue, Owens, Kavanagh and certain third parties related to the use of the proceeds of these loans and misconduct of the directors of the Suffolk Entities. The actions were settled between the parties and two default judgments were entered by the Delaware Bankruptcy Court against Sugrue.

64. According to the Offer to Purchase (defined below), "on March 23, 2005 the [PlusFunds] Board held a meeting to, among other things, consider and approve an amendment [to]the Stockholders' Agreement of the Company...pursuant to which certain restrictions on transfer formally contained in the Stockholders Agreement...would be removed."

65. On or about March 29, 2005 a draw on the Phase I Loan in the amount of $63,540,417.93 was used for the purchase of (a) the shares of PF Saleco, LLC ("PF Saleco") from Gryphon Holdings LP, Gryphon Holdings II LLLP, Gryphon Investments II, LLC and other individual and corporate investors (the "Gryphon Entities"), and (b) the PlusFunds Shares owned by Bousbib and Gonyx Capital, LLC.

66. PF Saleco was set up in February 2005 for the purpose of transferring the PlusFunds Shares owned by the Gryphon Entities to Suffolk. On information and belief, PF Saleco had no other assets or liabilities other than PlusFunds Shares. Rather than purchase the PlusFunds Shares directly from these shareholders, the PlusFunds Shares were transferred to PF Saleco and the ownership interests in PF Saleco were acquired by Suffolk using the Phase I Loan proceeds.[6]

67. Bousbib was the CEO and a member of the Board of Directors of PlusFunds until he left the company in February 2005, following his resignation in December 2004. Bousbib started with PlusFunds Ltd. in 2001 as a consultant, when PlusFunds, Ltd. sold technology assets to PlusFunds. Upon the conclusion of this sale Bousbib began working for PlusFunds, where he was ultimately promoted to the positions of President and Chief Executive Officer.

---

[6] This transaction was never collapsed and as of the date of the bankruptcy petition of PlusFunds, PF Saleco remained a shareholder of PlusFunds. For purposes of this Amended Complaint all references to PlusFunds Shares owned by Suffolk shall also include the ownership interests of PF Saleco.

916691-2

68. Internal communications related to Bousbib's departure, dated November 23, 2004, alluded to the "reckless behavior" of Sugrue, "inappropriate family interests[7]" that had taken precedence over the company, actions that would result "in complete shareholder value destruction" and Sugrue leading "the Company to its grave."

69. Gonyx Capital, LLC was established in February 2005 for the purpose of transferring the PlusFunds Shares held by Bousbib to Suffolk.

70. On June 7, 2005 and June 17, 2005, draws on the Phase I Loan in the amounts of $70,118,363.73 and $3,495,423.73, respectively, were used to purchase PlusFunds Shares from the Defendants, other than those specifically discussed above and in the following paragraph,[8] through a tender offer.

71. On information and belief, on or about October 4, 2005, a draw on the Phase I Loan in the amount of $17,037,352.33 was used for the purchase of PlusFunds Shares from Diego Winegardner ("Winegardner"), co-founder of PlusFunds and Vice Chairman of the PlusFunds Board, and Christopher Aliprandi, Chief Financial Officer of PlusFunds.

72. On information and belief, the remaining funds from the Phase I Loan were used to compensate professionals and service providers.

**Borrowing Requests For Suffolk Loans**

73. The Escrow Agreement between Suffolk, the Bank of New York and Refco Capital stated that funds would be released upon presentation of joint written instructions, signed by the borrower (Suffolk) and the lender (Refco), to the Bank of New York.

---

[7] At the time PlusFunds's Secretary and General Counsel was Sugrue's sister-in law.
[8] Other Defendants who were management or Board Members of PlusFunds included Susan Staisil, Secretary and General Counsel for PlusFunds, Randall Yanker, a member of the Board of PlusFunds, and Christopher Rose, Chief Operating Officer.

18

74. The funds used to purchase the shares from the Gryphon Entities and Bousbib were transferred from the respective escrow account through the execution of "Joint Written Instructions" signed by Owens and Bennett.

75. For the remainder of the Phase I Loan funds, borrowing requests, signed by Owens on behalf of Suffolk, notes and supporting documentation were submitted via Suffolk's counsel to Refco's counsel. Upon information and belief, Refco's counsel reviewed the borrowing requests and supporting documentation and confirmed with only Bennett whether the borrowing requests would be funded on the dates requested.

76. On information and belief Refco Capital did not establish any oversight over the draw requests, other than a cursory review provided by Bennett.

77. On information and belief, the Phase II Loan proceeds were disbursed to the Suffolk Entities on or about April 14, 2005, upon submission of borrowing requests and notes signed by the respective Suffolk Insiders and after wire instructions were signed approved by Bennett.

**The PlusFunds Tender Offer**

78. In furtherance of the scheme to force Bennett to buy the Suffolk Insiders' silence, the Suffolk Loans were used for the PlusFunds Tender Offer.

79. On March 29, 2005 a Membership Interest Purchase Agreement was executed whereby the interests of PF Saleco were purchased by Suffolk for an aggregate purchase price of $48,821,622.09, or $378.96 for each share of Series B Preferred Stock, $368.96 for each share of Series A Preferred Stock and a $358.09 for each share of common stock issuable upon exercise for a related Warrant that was purchased.

80. On March 29, 2005 a Stock Purchase Agreement was executed whereby the PlusFunds Shares owned by Gonyx Capital LLC were purchased by Suffolk LLC for $14,718,795.84, or $358.96 per share of common stock.

81. On information and belief, an Offer to Purchase dated May 4, 2005 (the "Offer to Purchase") was transmitted to the Defendants, with the exception of those discussed above, for the purpose of soliciting the purchase of the PlusFunds Shares owned by the Defendants.

82. The Offer to Purchase provided that on or before June 2, 2005, Suffolk offered to purchase series B preferred stock at a price of $378.96 and series A preferred stock at a price of $368.96. The Offer to Purchase did not include the common stock of PlusFunds or the series E common stock.

83. On information and belief, on or about June 2, 2005, a letter was sent to the Defendants by Suffolk announcing a subsequent offering period from June 3, 2005 to June 14, 2005.

84. Each of the Defendants, with the exception of the Gryphon Entities, communicated their acceptance of the Offer to Purchase through their respective Letter of Transmittal.

85. A Non-Binding Letter of Intent was executed between Suffolk and Winegardner for (i) the sale of Winegardner's Common Stock and Options at a price of $358.96 per share and (ii) the extension of a full recourse loan in the amount of $3,167,294 to Winegardner.

86. The agreements between the parties as outlined above, including the Membership Interest Purchase Agreement, the Stock Purchase Agreement, the Letter of Intent and the contracts created by the Offer to Purchase and Letters of Transmittal, are referred to herein collectively as the "Stock Purchase Agreements" or the "PlusFunds Tender Offer."

87. Pursuant to a Stock Purchase Agreements by and between each of the Defendants and Suffolk, the Defendants sold to Suffolk their respective ownership interests in PlusFunds.

88. **Schedule A** to this Amended Complaint reflects, by Defendant, the execution dates of the Stock Purchase Agreements, the number of shares sold, and the aggregate sales price for the shares sold.

89. Pursuant to the Stock Purchase Agreements by and between Defendants and Suffolk, dated as reflected on **Schedule A**, the Defendants sold their PlusFunds Shares to Suffolk in the amounts and for the purchase prices reflected on **Schedule A** (the "Tender Amount(s)" or "Fraudulent Transfer(s)").

**Intentional Misrepresentations by the Suffolk Insiders Regarding
the PlusFunds Tender Offer to Refco Capital and Others**

90. Upon information and belief, the Tender Amount was conveyed by Suffolk to the Defendants voluntarily and with actual intent to hinder, delay or defraud present and/or future creditors of Suffolk.

91. The Offer to Purchase, dated May 4, 2005, from Suffolk to the Defendants was incomplete, misleading and contained misrepresentations of fact. It also reveals how Suffolk concealed critical and important components of the flow of funds from Refco Capital.

92. The Offer to Purchase states that the purpose of the offers are to "acquire all of the outstanding shares of Series B Preferred Stock and all of the outstanding shares of series A Preferred Stock not already held by the Purchaser Group."

93. The Offer to Purchase further states that "None of Mr. Kavanagh, MKK Limited or Mr. Sugrue intended to tender any of their Shares in the Offers. Mr. Owens owns no shares in the Company. Mr. Diego Winegardner, a member of the Board, has entered into a letter of intent with the Purchase Group with respect to the sale of his shares of Series E Common

21

Stock and his shares of Series E Common Stock issuable upon exercise of this Series E Options to the Purchase subsequent to the expiration of the Offers."

94. In addition, the Offer to Purchase disclosed "In addition, affiliates of the Purchaser have borrowed additional amounts from the Lender for other purposes unrelated to the Offers and have pledged Shares held by them prior to the Prior Purchases and the Offers."

95. The Offer to Purchase did not disclose that SUG was receiving approximately $19.4 million from the proceeds of the Suffolk Loans.

96. The Offer to Purchase did not disclose that the sole owner of SUG was Sugrue.

97. The Offer to Purchase also failed to disclose that through the funds received by SUG, Sugrue would have sole access to $19.25 million, which he could—and indeed, did—use for his personal benefit.

98. The Offer to Purchase did not disclose that KAV was receiving approximately $11.35 million from the proceeds of the Suffolk Loans.

99. The Offer to Purchase did not disclose that the sole owner of KAV was Kavanagh.

100. The Offer to Purchase also failed to disclose that through the funds received by KAV, Kavanagh would have sole access to $11.35 million, which he could—and indeed, did—use for his personal benefit.

101. The Offer to Purchase did not disclose that MKK was receiving approximately $19.25 million from the proceeds of the Suffolk Loans.

102. The Offer to Purchase did not disclose that the indirect owners of MKK included Sugrue and Owens.

22

103. The Offer to Purchase also failed to disclose that through the funds received by MKK, Sugrue and Owens would have access to their proportionate share of $19.25 million, which they could—and indeed, did—use for their personal benefit.

104. The Offer to Purchase was intentionally misleading regarding, in particular, the benefit to be obtained by Owens through the entire transaction, as the Offer to Purchase indicates that Owens did not possess any shares in PlusFunds. In making this representation, the Offer to Purchase creates the false impression that Owens would not derive any personal benefit through the transaction.

105. This false impression was created despite the fact that Owens—through his undisclosed interests in MKK—would directly and personally benefit from the transaction.

106. The Offer to Purchase also failed to disclose that each of Sugrue, Kavanagh, and Owens, through their ownership interests in the Suffolk Entities, would receive material cash proceeds of the Suffolk Loans, which could be utilized for their own personal enjoyment.

107. The Offer to Purchase also failed to disclose that there was no sound business purpose or justification for the transfer of funds to Sugrue, Kavanagh, and Owens, and that these payments were being made in exchange for little, if any, consideration.

108. Upon information and belief, the only consideration provided by Sugrue, Kavanagh, and Owens for these funds was a security interest in the shares of PlusFunds that were owned or controlled by the respective Suffolk Entities—or their direct, or indirect, owners.

109. According to the Offer to Purchase, the "Purchaser Group has no present intention of causing the Company to change its fundamental business, to sell or otherwise dispose of

the Company or all or any material part of the Company's business or to amalgamate, merge, liquidate or otherwise wind-up the Company's business."

110. As disclosed in the Offer to Purchase, PlusFunds created a Special Committee consisting of a sole independent director to oversee the purchase. The sole independent director was Randall Yanker, one of the Defendants. A Special Committee was formed due to the "actual or potential conflicts of interest which may result from the interests described above." Mr. Yanker was chosen because he was not "affiliated with the Purchase Group."

111. The Offer to Purchase does not shed any light on the referenced conflicts.

112. Mr. Yanker was chosen despite the fact that he was a shareholder of PlusFunds. According to the Offer to Purchase, "Mr. Yanker has informed the Purchaser that he intends to tender all of his Shares in the Offers. Mr. Yanker beneficially owns 451.93 shares of the Company's Series A Preferred Stock, which represents approximately 0.07% of the outstanding shares of the capital stock of the Company."

113. According to the Offer to Purchase, the existing Board of PlusFunds had "determined to remain neutral with regard to the Offers because Mr. Mark Kavanagh, Mr. Brian Owens and Mr. Christopher Sugrue, each members of the Board, are affiliated with the Purchaser".

114. Notwithstanding the representations made in the Offer to Purchase, it is implausible to believe the PlusFunds Board was neutral because they were, in fact, the members of the acquiring company, Suffolk.

**Willful Ignorance of the Defendants**

115. The Defendants knew, or had reason to believe, that the Tender Amount was exponentially greater than the value of the PlusFunds Shares.

116. On information and belief, at least one Defendant valued their ownership interests in PlusFunds at a net book value of zero on their internal books and records before the PlusFunds Tender Offer.

117. Audited financial statements were available to show the financial state of PlusFunds at December 31, 2004 and for years prior.

118. The Defendants who were former or current employees, officers, directors or insiders of PlusFunds clearly had pertinent details regarding the ongoing operations of PlusFunds, internal disruptive dynamics and lack of value.

119. The Offer to Purchase clearly disclosed that "there [was] no public market for the [PlusFunds] Shares" and they [were] "highly illiquid."

120. The Offer to Purchase provided to the Defendants by Suffolk and the Suffolk Insiders set forth detailed historical financial information of PlusFunds.

121. The following snapshot summary from the Offer to Purchase shows that PlusFunds was thinly capitalized and operated with small profit margins.

916691-2

### Year Ended December 31, 2004

| | |
|---|---|
| **Total Assets:** | $10,360,562 |

Including intangible assets of $3,622,141.

| | |
|---|---|
| Current Liabilities: | $3,737,374 |
| Long-Term Liabilities: | 834,162 |
| Shares subject to mandatory redemption: | 2,497,740 |
| Shareholders Equity: | 3,291,286 |
| **Total Liabilities & Shareholders Equity** | $10,360,562 |

| | |
|---|---|
| Revenue: | |
| Management Fees: | $25,235,653 |
| Risk Services: | 580,660 |
| Other Revenue: | 278,699 |
| Total Revenue: | 26,095,012 |
| Total Expenses: | 22,325,640 |
| Net Income Before Taxes: | 3,769,372 |
| Provision for Income Taxes: | 1,777,962 |
| Net Income: | $1,991,410 |

PlusFunds showed a moderate upward trend of historical assets under management ("AUM").

122. The AUM of PlusFunds as of March 31, 2005 was $2.9 billion, which is unchanged from the beginning of 2005. According to the Offer to Purchase, this "reflects poor index performance (down 0.60% year to date March 31) and minimal net subscriptions in the first quarter." It further states that "recent press coverage of [the] hedge funds industry has highlighted the decelerating asset growth that hedge funds have experienced."

123. With the earnings as set forth in the Offer to Purchase PlusFunds would have needed to earn approximately $40 million per year and radically increase its AUM for Suffolk to make a profit, or even meet its obligations under the Suffolk Loans.

916691-2

**Control of the Suffolk Loan Proceeds**

124. At all times the Suffolk Insiders had control of the proceeds of the Suffolk Loans. The Suffolk Loans did not inure to anyone's benefit except the Suffolk Insiders and the Defendants, and ultimately damaged Suffolk, as well as Suffolk's creditors.

125. Bennett knew that Refco Capital would not receive a dollar in repayment of the Suffolk Loans, no one else at Refco, with the exception of Bennett's co-conspirator Maggio, seems to have been aware of this fact.

126. A Refco internal review of the Suffolk Loans indicates that the loan documents between Refco Capital and the Suffolk Entities were typical loan documents that allowed for standard protections on behalf of the lender, including collateral to secure their loan(s). However, this internal review was conducted in ignorance of the underlying scheme.

127. Refco Capital itself was damaged by making loans that could never be repaid, and that were collateralized by assets that were materially overvalued. As Maggio testified, the only person to value PlusFunds was Bennett himself, and he valued PlusFunds at a completely unrealistic and fraudulent multiple.

128. Refco's CFO and others at Refco Capital were innocent of the fraud related to the Suffolk and PlusFunds transactions. Refco's CFO prepared a memo indicating that he believed the loans to Suffolk were adequately collateralized. Bennett and Maggio intentionally withheld information about the true value of PlusFunds from others at Refco. The memo by Refco's CFO also made clear that Suffolk was independently controlled and not an instrument of Refco or conduit for Refco.

129. Internal communications between Refco, its attorneys Mayer Brown LLP ("Mayer Brown"), and Suffolk's attorneys, Gibson Dunn & Crutcher ("Gibson Dunn"),

916691-2